

# IN THE
# TENTH COURT OF APPEALS

### No. 10-08-00271-CV

**ROYAL H. BENSON, III, M.D., INDIVIDUALLY
AND D/B/A SOUTHWEST CENTER FOR
FEMALE GENITAL REFINEMENT, AND
BENSON OB/GYN CENTER, PA,**

                                                                    **Appellants**

 **v.**

**JO LYNN VERNON,**

                                                                    **Appellee**

### From the 85th District Court
### Brazos County, Texas
### Trial Court No. 08-000533-CV-85

## OPINION

Jo Lynn Vernon sued Royal H. Benson, III, M.D., Individually and d/b/a Southwest Center for Female Genital Refinement, and Benson OB/GYN Center, P.A., for injuries resulting from a breast augmentation procedure. After receiving Vernon's original and supplemental expert reports, Dr. Benson filed a motion to dismiss Vernon's lawsuit pursuant to section 74.351(b) of the Civil Practice and Remedies Code. The trial

court denied the motion. On appeal, Dr. Benson challenges the denial of his motion to dismiss, arguing that Vernon's expert reports (1) fail to address each claim pleaded by Vernon (issue one); (2) fail to provide a fair summary of the standard of care (issue two); and (3) contain conclusory opinions and assumptions regarding the standard of care and causation (issues three and four). In one cross-point, Vernon seeks a thirty-day extension to cure any deficiencies in her report. We affirm in part, reverse and render in part, and reverse and remand in part.

## STANDARD OF REVIEW AND APPLICABLE LAW

When considering a motion to dismiss under section 74.351, the issue for the trial court is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see also Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). An "expert report" means:

> A written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2008). To constitute a "good-faith effort," the report must discuss the standard of care, breach, and causation with sufficient specificity to: (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Bowie*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879.

The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878. Although an expert report need not marshal all the plaintiff's proof, the expert may not merely state conclusions about the required elements of standard of care, breach, and causation. *Bowie,* 79 S.W.3d at 52. The report must include the expert's opinion on each of the three elements. *Id.; Palacios,* 46 S.W.3d at 878. The expert must explain the basis of his statements to link his conclusions to the facts. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex. 1999).

We review a trial court's order on a motion to dismiss a claim for failure to comply with the expert report requirements under an abuse-of-discretion standard. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878. When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for the trial court's judgment. *See Flores v. Fourth Ct. of Appeals,* 777 S.W.2d 38, 41 (Tex. 1989).

## EXPERT REPORT

In his reports, William H. Gorman, M.D., explained that Dr. Benson performed a breast augmentation for Vernon in his office on a Sunday afternoon. Dr. Benson sedated Vernon with a local anesthetic. Dr. Gorman identified the standard of care:

> The standard of care for a surgeon performing a breast augmentation is to not cause a pneumothorax during the procedure. Furthermore, if a pneumothorax is inadvertently/accidentally caused, the standard of care would require early recognition and appropriate treatment. The standard of care for anesthesia during a breast augmentation requires that an anesthetist, anesthesiologist or R.N. monitor and record vital signs of an anesthetized or sedated patient at least every five minutes.

Dr. Gorman explained that pneumothorax is a rare but known possible complication of breast augmentation, commonly caused by the "needle injection for local anesthesia and interoperative laceration of the pleura." This occurs when the needle is advanced too far or is misplaced/misdirected. This can be prevented by paying attention to the "placement in depth of the injection" and the "dissection plane." Symptoms of pneumothorax include respiratory thoracic pain, progressive dyspnea of variable intensity, cyanosis, subcutaneous emphysema, and diminished air movement. Diagnosis is made by clinical examination, chest radiography, or computerized tomography. Treatments include symptomatic care, simple observation, regular radiographic controls, needle aspiration, or insertion of a chest tube.

Dr. Gorman opined that Dr. Benson breached the standard of care by only recording Vernon's vital signs every *thirty* minutes and by causing Vernon to suffer a pneumothorax during surgery. He believed that Dr. Benson caused the pneumothorax by "stray[ing] out of the normal dissection plane and enter[ing] the pleural cavity." He based this conclusion on the fact that Vernon had no symptoms of pneumothorax before surgery. In the recovery room, Vernon complained of shortness of breath. Dr. Benson neither ordered a chest x-ray nor listened to her breathing with a stethoscope. The following week, Vernon experienced prolonged shortness of breath and significant chest wall pain. Dr. Gorman noted that her records contain complaints regarding "inadequate pain control" and "difficulty breathing." Yet, the pneumothorax went undiagnosed and untreated for nearly a week. Dr. Gorman explained that these symptoms should "never be ignored or treated lightly." He opined that Dr. Benson

breached the standard of care for surgical treatment and postoperative care and that Vernon's "prolonged and painful course" directly resulted from Dr. Benson's "procedure and care which fell far below the normal and expected standard of care."

Dr. Gorman further questioned Dr. Benson's qualifications and credentials for performing the procedure. Dr. Gorman stated that breast augmentations should be performed or supervised by a board certified plastic surgeon. He explained that the American Society of Plastic Surgeons requires surgeries performed under anesthesia, other than minor local anesthesia and/or minimal oral tranquilization, to use an accredited and licensed or certified facility. He states that it is reasonable to expect a surgeon to have the experience and training necessary to meet these "stringent credentialing standards" and to limit his procedures to his training and experience. Referring to Vernon's operation, Dr. Gorman opined that "[p]atient safety cannot be a strong consideration by a doctor who performs surgery in such sub-standard conditions and with such lack of specialized training."

## ANALYSIS

In issues one, two, three, and four, Dr. Benson contends that Dr. Gorman: (1) fails to address each claim raised by Vernon; (2) fails to provide a fair summary of the standard of care; and (3) bases many conclusions on assumptions unsupported by facts.

### Failure to Address All Claims Raised in the Petition

Vernon's petition alleges negligence resulting in two injuries: the pneumothorax and asymmetry of her right breast. She raised numerous allegations regarding each injury, but Dr. Benson complains that Dr. Gorman's reports fail to address: (1) improper

placement and failure to assure proper placement of the right breast implant; (2) failure to refer Vernon to a respiratory specialist; (3) failure to have Vernon obtain a chest x-ray from an urgent care clinic; (4) failure to identify the cause of swelling and asymmetry of the right breast; (5) alteration and fabrication of medical records; (6) future pain and mental anguish; (7) future medical expenses; (8) past and future physical incapacity, disability, and disfigurement; and (9) lost earnings.

Citing *Schmidt v. Dubose*, 259 S.W.3d 213 (Tex. App.—Beaumont 2008, no pet.), Vernon contends that Dr. Benson's argument lacks merit. In *Schmidt*, the Beaumont Court considered whether an expert's "partial change in opinion expressed during discovery means the expert report did not represent an objective good faith effort to comply with section 74.351(r)(6)." *Schmidt*, 259 S.W.3d at 218. Dubose claimed that Schmidt failed to recognize that her bile duct was divided during an operation. *See id*. at 217-18. In his deposition, Dubose's expert opined that Schmidt incorrectly identified the bile duct and divided the wrong duct. *Id*. at 218. Finding the report to be a good faith effort, the Beaumont Court held:

> No new cause of action has been asserted as a result of the partial change in the expert's opinion in this case. Multiple causes of action do not arise dependent on whether the physician was negligent before, during, or after the wrong cut. *If another health care liability cause of action is alleged about which no expert report is made, a different issue may be presented. This case does not present that issue.*

*Id*. (emphasis added). *Schmidt* does not address the specific issue raised in this appeal.

Dr. Gorman's reports do not in any way address the three statutory elements as related to Dr. Benson's negligence and the asymmetry of the right breast. His reports

are inadequate as to negligence based on this claimed injury. *See Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.*, 224 S.W.3d 448, 455 (Tex. App.—Fort Worth 2007, no pet.). The reports fail to inform Dr. Benson of the specific conduct sued on with respect to asymmetry of the right breast.

Neither does Dr. Gorman address alteration and fabrication of medical records. However, this is not a health care liability claim required to be addressed in an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(13) (Vernon 2005) ("'Health care liability claim'" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.").

As for damages, Dr. Gorman was only required to address the standard of care, breach, and causation. *See Palacios*, 46 S.W.3d at 878-79. In doing so, he need only inform Dr. Benson of the specific conduct Vernon has called into question and provide a basis for the trial court to conclude that the claims have merit. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. He is not required to prove up Vernon's damages.

In summary, we sustain issue one in part based on the failure of Dr. Gorman's reports to address Vernon's negligence claim as to asymmetry. Dr. Benson's first issue is overruled as to damages and alteration/fabrication of medical records.

**Standard of Care and Causation**

Dr. Benson complains that Dr. Gorman failed to provide a fair summary of the standard of care by neglecting to explain how he breached the standard of care, what he should have done differently to prevent and treat the pneumothorax, or how the appropriate depth and dissection plane are determined. He contends that Dr. Gorman's analysis as to the standard of care and causation is conclusory and based on assumptions unsupported by the facts. Dr. Benson further complains that Dr. Gorman fails to provide a fair summary of the damages alleged or explain how different treatment would have prevented Vernon's shortness of breath and chest pain.

Vernon was not required to present evidence in the report as if she were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *Id*. Dr. Gorman's reports need only fulfill two required purposes: (1) inform Dr. Benson of the specific conduct Vernon has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Bowie*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879. An expert report need not marshal all of the plaintiff's evidence. *Bowie*, 79 S.W.3d at 52; *see also Palacios*, 46 S.W.3d at 878. After reviewing the reports, we conclude that the trial court was justified in finding that they discuss the standard of care, breach, and causation with sufficient specificity to fulfill the statutory requirements. *See Williams v. Mora*, 264 S.W.3d 888, 892 (Tex. App.—Waco 2008, no pet.); *see also Hamilton v. Durgin*, No. 10-08-00146-CV, 2008 Tex. App. LEXIS 8356, at *2-5 (Tex. App.—Waco Nov. 5, 2008, no pet.)

(mem. op.). The trial court did not abuse its discretion by denying Dr. Benson's motion to dismiss with regard to the pneumothorax claim. We overrule Dr. Benson's second, third, and fourth issues.

## EXTENSION

Having found that Dr. Gorman failed to address Vernon's asymmetry claim, we must address her cross-point in which she contends that we should remand this cause to the trial court to consider granting a thirty-day extension.

If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). In *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669 (Tex. 2008), cited by Vernon, the San Antonio Court dismissed the plaintiffs' claims because an expert report was conclusory as to causation. *See Gardner*, 274 S.W.3d at 670. The Supreme Court noted that the report was not "so deficient as to constitute no report at all." *Id*. at 671 (citing *Ogletree v. Matthews*, 262 S.W.3d 316, 323 (Tex. 2007) (Willett, J., concurring) and *Lewis v. Funderburk*, 253 S.W.3d 204, 211 (Tex. 2008) (Willett, J., concurring)). Without disturbing the deficiency finding, the Supreme Court vacated the judgment and remanded the case to the trial court to consider granting an extension to cure. *Id*. at 670.

We, however, question whether Dr. Gorman's reports are "so deficient as to constitute no report at all" as to the asymmetry claim. *Ogletree* and *Funderburk* guide our analysis.

In *Ogletree*, the Supreme Court stated that dismissal is not mandatory for "deficient, but curable, reports;" rather, the trial court may grant a thirty-day extension to allow parties to cure the deficiencies. *Ogletree*, 262 S.W.3d at 320-21 ("[I]f a deficient report is served and the trial court grants a thirty day extension, that decision--even if coupled with a denial of a motion to dismiss--is not subject to appellate review."). In this important respect, a deficient report differs from an absent report. *Id*. at 320.

In his concurrence, Justice Willett explained that "classification of all purported expert reports as either absent or deficient may prove inapposite in rare cases--where the claimed 'report' is actually no such thing--and inadvertently expand the availability of the thirty-day extension provided by section 74.351(c) beyond what the Legislature intended." *Id*. at 322 (Willett, J., concurring). In addition to absent reports and deficient reports, he identified a third type of report: "a document so utterly lacking that, no matter how charitably viewed, it simply cannot be deemed an 'expert report' at all, even a deficient one." *Id*. at 323. He explained that "some material does not even rise to the level of a deficient report because it fails to address the statutorily mandated elements." *Id*. "Such documents constitute no expert report at all." *Id*.

> To be clear, I am not describing a situation where "elements of the report have been found deficient," thus making the report eligible for an opportunity to cure; rather, I am describing a situation where elements of the report have not been found at all--where the plaintiff submits nothing but doctor- or provider-signed material that contains zero (or practically zero) discussion of what makes a report a report. Elements must be present to be labeled deficient; if they are nonexistent, so is the report.

*Id*. This third type of report "merits dismissal just like an absent report." *Id*.

In *Funderburk*, Lewis argued that section 74.351(c) "permits only amendments by the original expert rather than substitutions by a new one." *Funderburk*, 253 S.W.3d at 208. The Supreme Court held that the statute does not prohibit a claimant from "changing experts midstream." *Id*. In his concurrence, Justice Willett noted that, although the issue was not before the Court, Funderburk's "initial 'report' was literally no report at all," but was a mere "thank-you for-your-referral letter," which did not address the required statutory elements and "never once 'accuse[s] anyone of doing anything wrong.'" *Id*. at 210-11 (Willett, J., concurring). "When compared with the standards for expert reports set by the Legislature, this letter is 'so utterly lacking that, no matter how charitably viewed, it simply cannot be deemed an 'expert report' at all, even a deficient one.'" *Id*. at 211. "A wholly absent report is incurable and cannot be deemed a deficient report eligible for a thirty-day extension." *Id*. at 210. Dismissal was mandatory. *Id*. at 212.

Dr. Gorman's reports do not address the statutory requirements with regard to asymmetry or even suggest that Dr. Benson did anything wrong in this regard. As to this injury, the reports are "so deficient as to constitute no report at all" and dismissal is mandatory. *Gardner*, 274 S.W.3d at 670; *see Ogletree*, 262 S.W.3d at 322-23 (Willett, J., concurring); *see also Funderburk*, 253 S.W.3d at 211-12 (Willett, J., concurring); *Farishta*, 224 S.W.3d at 455 (sustaining dismissal of claims not addressed in expert report).

## CONCLUSION

We affirm the portion of the trial court's order denying Benson's motion to dismiss as to Vernon's pneumothorax claim. We reverse the portion of the court's order

denying Benson's motion to dismiss Vernon's asymmetry claim and render a judgment of dismissal on that claim. In addition, we remand this cause to the trial court for further proceedings consistent with this opinion, including a hearing to determine the amount of attorney's fees and costs to be awarded to Benson in relation to the dismissal of the asymmetry claim.

FELIPE REYNA
Justice

Before Chief Justice Gray,
     Justice Reyna, and
     Justice Davis
     (Chief Justice Gray concurring and dissenting)
Affirmed in part; reversed and rendered in part; reversed and remanded in part
Opinion delivered and filed August 12, 2009
[CV06]